RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0120p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JUDY FULKERSON,

                       *Plaintiff-Appellee*,

    *v.*

UNUM LIFE INSURANCE COMPANY OF AMERICA,

                       *Defendant-Appellant*.

> No. 21-3367

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:19-cv-01180—David A. Ruiz, Magistrate Judge.

Argued: December 8, 2021

Decided and Filed: June 3, 2022

Before: SUTTON, Chief Judge; SILER and READLER, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Brett K. Bacon, FRANTZ WARD LLP, Cleveland, Ohio, for Appellant. Robert P. Rutter, RUTTER & RUSSIN, LLC, Cleveland, Ohio, for Appellee. **ON BRIEF:** Brett K. Bacon, Olivia Lin Southam, FRANTZ WARD LLP, Cleveland, Ohio, for Appellant. Robert P. Rutter, RUTTER & RUSSIN, LLC, Cleveland, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

      CHAD A. READLER, Circuit Judge. Daniel Tymoc died in a car crash while speeding and driving recklessly. Tymoc's mother, Judy Fulkerson, pursued accidental death benefits under Tymoc's life insurance policy, issued by Unum Life Insurance Company. Unum, however, denied those benefits, invoking a policy exclusion for "losses caused by, contributed to

by, or resulting from . . . commission of a crime."  Fulkerson successfully challenged Unum's interpretation of the crime exclusion in the district court and was awarded the $100,000 accidental death benefit.  Unum now appeals.  Because reckless driving falls within the unambiguous plain meaning of crime, we reverse that aspect of the district court's judgment.

I.

Daniel Tymoc died in a single-car accident.  At the time of the accident, Tymoc was traveling between 80 and 100 miles per hour, well above the 60 mile per hour speed limit.  As Tymoc attempted to pass multiple cars, the gap between a car in the right lane and a box truck in the left lane closed.  In an apparent attempt to avoid a collision, Tymoc veered to the right, causing his vehicle to drive off the road, roll down an embankment, strike multiple trees, and flip over several times before coming to rest at the bottom of a hill.  Tymoc died at the scene.

Through his employer, Tymoc was covered by a Unum life insurance policy that provided both basic life insurance coverage and an additional accidental death benefit.  His mother, Judy Fulkerson, sought to recover benefits as the policy's beneficiary.  Unum approved a $100,000 payment of group life insurance benefits.  But it withheld $100,000 in accidental death benefits on the basis that Tymoc's conduct at the time of the accident—speeding and reckless driving, conduct Fulkerson does not dispute—caused his death, thereby triggering the policy's crime exclusion.

Invoking the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1191d, Fulkerson sued Unum to recover, as relevant here, the accidental death benefits.  *See* 29 U.S.C. § 1132(a)(1)(B).  The parties cross-moved for judgment on the administrative record, which the district court entered in Fulkerson's favor as to the accidental death benefits.  Unum timely appealed.

II.

Unum prevails if either reckless driving or speeding triggers the policy's crime exclusion.  Concluding, as we do, that the former falls within the crime exclusion, we need not consider the latter.

A. Tymoc's employer provided him a life insurance policy as part of an employee benefit plan. For a "participant or beneficiary" who seeks "to recover benefits due to him under the terms of his plan," ERISA provides the policyholder or beneficiary a statutory cause of action. 29 U.S.C. § 1132(a)(1)(B). That is the provision Fulkerson, as the beneficiary of Tymoc's life insurance policy, invokes here.

With ERISA governing today's appeal, two threshold principles deserve emphasis. One, the parties agree that we should review the crime exclusion's applicability here de novo. *See Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 264 (6th Cir. 2018) (noting the different standards of review that may apply in an ERISA case). Two, when interpreting an ERISA-covered insurance policy, "we apply federal common law rules of contract interpretation." *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) (en banc). To do so, we begin with the policy's text. *See id.* Unless that text is ambiguous, we presume the policy means what it says and therefore give effect to its "plain meaning in an ordinary and popular sense." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011) (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 711 (6th Cir. 2000)). On that score, a policy is ambiguous only if it "is susceptible to multiple reasonable interpretations, not just because clever lawyers can disagree over the meaning of terms." *Clemons*, 890 F.3d at 269.

B. With these legal tools in hand, we begin the job before us: interpreting the crime exclusion in Tymoc's life insurance policy. We start with the policy's text. It excludes accidental death benefits for "any accidental losses caused by, contributed to by, or resulting from . . . an attempt to commit or commission of a crime." And it frames the question underlying this appeal: is reckless driving a "crime" within the meaning of the exclusion?

1. As the policy does not expressly answer that question, we first turn to dictionaries to determine the term's plain meaning. *See, e.g.*, *Adams v. Anheuser-Busch Cos.*, 758 F.3d 743, 748 (6th Cir. 2014); *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 332–33 (6th Cir. 2009). Black's Law Dictionary defines "crime" as "[a]n act that the law makes punishable; the breach of a legal duty treated as the subject-matter of a criminal proceeding." *Crime*, Black's Law Dictionary (11th ed. 2019). Merriam-Webster's Collegiate Dictionary agrees. It defines "crime" as "an illegal act for which someone can be punished by the government; *especially*:

a gross violation of law," "a grave offense especially against morality," and "criminal activity." *Crime*, Merriam-Webster's Collegiate Dictionary (last visited June 2, 2022). The American Heritage Dictionary similarly instructs that a crime is "[a]n act committed in violation of law where the consequence of conviction by a court is punishment, especially where the punishment is a serious one such as imprisonment," "[u]nlawful activity," and "[a] serious offense, especially one in violation of morality." *Crime*, American Heritage Dictionary of the English Language 430 (5th ed. 2011). Read together, these lexiconic sources indicate that the plain meaning of "crime" is "an illegal act for which someone can be punished by the government."

The Eighth Circuit's decision in *Boyer v. Schneider Electric Holdings, Inc.*, 993 F.3d 578 (8th Cir. 2021), supports our view. There, an individual insured by Unum died while "passing vehicles in a no-passing zone and driving approximately 80 miles per hour in a 35 mile-per-hour zone," both misdemeanors under Missouri law. *Id.* at 580. Applying a crime exclusion identical to the one at issue here, Unum denied benefits. *Id.* On abuse of discretion review, the Eighth Circuit upheld Unum's decision, concluding that the act of "high-speed motoring and improper passing was akin to reckless driving," which qualifies as a "crime" as that term was used in "[c]ommon dictionaries." *Id.* at 581–83.

Our reading of "crime" is also consistent with the tapestry of state laws regulating Tymoc's conduct. All agree that Tymoc was driving recklessly in violation of Ohio law, that is, "in willful or wanton disregard of the safety of persons or property." Ohio Rev. Code Ann. § 4511.20 (West 2022). And all agree that this misdemeanor offense resulted in his death. To be sure, one state's idiosyncratic decision to punish certain behavior may not reflect whether that behavior is widely understood to be a crime. *See Kovach*, 587 F.3d at 332 (explaining that courts must interpret an ERISA plan pursuant to "the plain meaning of its language as it would be construed by an ordinary person" (citation omitted)); *cf. Boyer*, 993 F.3d at 583 (reasoning that an insurer "is not bound to incorporate a particular State's criminal law in fashioning its own definition of crime" because "that approach could lead to benefits varying by jurisdiction"). But a broader survey of state law assures us that the ordinary meaning of "crime" unambiguously includes reckless driving. Indeed, the National Highway Traffic Safety Administration reports that 48 states expressly punish "reckless driving." *Summary of State Speed Laws*, NHTSA

(12th ed. 2012), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/summary_state_speed_la ws_12th_edition_811769.pdf (last visited June 2, 2022) (note the summary chart on pages vi–ix). The lone exceptions are Maine and Vermont.  That these two states followed "The Road Not Taken" by 48 others, however, does not mean Tymoc's conduct would go unpunished in much of northern New England.  Robert Frost, *The Road Not Taken and Other Poems* 1 (Dover Publ'ns 2012).  After all, even without the reckless driving moniker, both Maine and Vermont punish substantially the same dangerous driving behaviors as their sister states.  The Pine Tree State penalizes "[d]riving to endanger" and exceeding the speed limit by 30 miles per hour or more.  Me. Rev. Stat. Ann. tit. 29-A, §§ 2074(3), 2413 (West 2022).  These offenses, labeled Class C and E crimes under Maine law, are punishable by imprisonment and a fine.  *See, e.g.*, *id.* § 2074(3) ("A person commits a Class E crime if that person operates a motor vehicle at a speed that exceeds the maximum rate of speed by 30 miles per hour or more."); *id.* § 2413; *id.* tit. 17-A, §§ 1604(1)(C), (E), 1704(3), (5).  To the same end, the Green Mountain State outlaws negligent and grossly negligent operation of a vehicle, with both offenses also punishable by imprisonment and a fine.  Vt. Stat. Ann. tit. 23, § 1091 (West 2022).

All things considered, Tymoc's reckless driving would constitute a crime in every state in the Union.  To our eye, this is particularly persuasive evidence that the plain, ordinary meaning of crime includes reckless driving.  The tragic facts of this case, moreover, make it easy to see why every state follows this approach.  Reckless driving endangers not only the life and property of the perpetrator, but also other individuals unlucky enough to be in the vicinity.  Case in point, Tymoc nearly collided with one (and perhaps two) other cars while attempting the high-risk passing maneuver that led to his own death.

2. The contemporary common usage of the term "reckless driving" further supports our view that Tymoc's conduct fits within the ordinary meaning of "crime."  On this front, corpus linguistics is a helpful tool in assessing common usage.  *See United States v. Woodson*, 960 F.3d 852, 855 (6th Cir. 2020) (relying on corpus linguistics); *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 439–40 (6th Cir. 2019) (Thapar, J., concurring in part and in the judgment) (same).  By corpus linguistics, we mean a collection of databases containing print and spoken media that can be culled for examples of a word's ordinary usage.  *Wilson*, 930 F.3d at 440.  As dictionaries

often "make no claims about the ordinariness of the words they define or the senses they assign those words," a corpus resource can foster a more rigorous analysis of a term's ordinary meaning. *State v. Rasabout*, 356 P.3d 1258, 1273 (Utah 2015) (Lee, A.C.J., concurring in part and concurring in the judgment) (cleaned up). Although more commonly used in the constitutional and statutory interpretive settings, these resources seemingly have the same force in many contractual settings as well. *See* Stephen C. Mouritsen, *Contract Interpretation with Corpus Linguistics*, 94 Wash. L. Rev. 1337, 1341 (2019) ("Corpora can provide evidence of the way that language is used by the contracting parties—evidence that was not previously available via dictionaries or introspection."). That includes interpreting everyday terms in "a contract drafted by a national or multi-national insurance company." *Id.* at 1364–65 (noting corpus linguistics' usefulness when interpreting an insurance contract "according to the shared linguistic conventions of a nationwide speech community").

A search of the Corpus of Contemporary American English for the phrase "reckless driving" as used between 1990 and 2018 (the year after Tymoc's accident) yields over 300 results. *See Reckless Driving*, Corpus of Contemporary American English, https://www.english-corpora.org/coca/ (last visited June 2, 2022). Tellingly, a vast majority recount instances in which some manner of prosecution occurred, where individuals either were "charged," "convicted," and/or "sentenced" for reckless driving. *Id.* A handful of examples illustrate the point:

- "Begay was treated at a Portland hospital for non-life-threatening injuries. He was given criminal citations for driving under the influence of intoxicants and reckless driving." Allen Brettman, *Driver, 18, accused of smashing into side of parked police car*, The Oregonian, https://www.oregonlive.com /portland/2016/11/driver_18_accused_of_smashing.html (last visited June 2, 2022).

- "Mr. Claybourne, you're being charged with driving under the influence and reckless driving." *Nashville: I Fall to Pieces* (CMT television broadcast Sept. 25, 2013).

- "Paul Raef was charged for four misdemeanors, including 'reckless driving, failing to obey a peace officer, and two counts of following another vehicle too closely and reckless driving with intent to capture picture for commercial gain,' reports the L.A. Times." Nadine Cheung, *Justin Bieber Car Chase Charges*

*Dismissed by Judge*, Popcrush, https://popcrush.com/justin-bieber-car-chase-charges-dismissed/ (last visited June 2, 2022).

- "Lopez was also charged with speeding, reckless driving, and driving on a suspended or revoked license." Megan Jones, *Aurora man accused of leading police on high-speed chase*, Chicago Tribune, https://www.chicagotribune.com/suburbs/aurora-beacon-news/ct-abn-aurora-man-arrested-dui-st-0129-story.html (last visited June 2, 2022).

- "A Detroit police union official who swerved off roads and through the Holly Academy school campus last winter was convicted Monday of reckless driving but will avoid prison and the loss of his police license." Mike Martindale, *Detroit cop guilty of misdemeanor in school joyride*, The Detroit News, https://www.detroitnews.com/story/news/local/oakland-county/2017/10/02/detroit-police-union-head-guilty-misdemeanor/106241342/ (last visited June 2, 2022).

- "Cullip pleaded guilty to vehicular homicide, and reckless driving in the death of 16-year old Chad Britton." *PBS NewsHour* (PBS television broadcast Dec. 15, 2016).

Some entries go a step further, explicitly referring to "reckless driving" as a crime:

- "In addition to using 'Leandra's Law' to increase potential charges in a New York DUI and DWI arrest, another crime that is often alleged in a drunk driving incident is the crime of Reckless Driving (VTL 1212)." Jeremy Saland, *Reckless Driving (NY VTL 1212) & DWI (NY VTL 1192): Is Evidence of Intoxication Per Se Proof of Recklessnes[s] in a New York DUI Arrest*, New York Criminal Lawyer Blog, https://www.newyorkcriminallawyer-blog.com/reckless-driving-and-intoxication/ (last visited June 2, 2022).

- "All right, I admit it! I flattened the damn fence! What are you gonna do, lock me up? Court finds the defendant guilty of crimes under code 453-19 reckless driving, and 466-2, reckless endangerment." *Doc Hollywood* (Warner Bros. 1991).

- "Unarmed but distraught, Small's crime to that point had been reckless driving and leading police on an erratic low-speed chase that ended when her car, tires flattened to the rims, spun out on a suburban street." Brad Schrade, *Did Caroline Small Have to Die?*, Atlanta Journal-Constitution, https://investigations.ajc.com/caroline-small-shooting/ (last visited June 2, 2022).

- "The newspaper reported that in many instances, prosecutors dropped the DWI case but refiled it as another crime, such as obstruction of a highway or reckless driving, because they did not have enough evidence to obtain a DWI conviction." Tony Plohetski & Christian McDonald, *Small Rise in DWIs: An American-Statesman Review*, Austin-American Statesman, Aug. 11, 2013, at A1.

That reckless driving has been widely understood to be an illegal act for which one can be punished by law furthers our assessment that this conduct amounts to a "crime."

To sum up, Tymoc's reckless driving triggered the crime exclusion in his Unum life insurance policy. As a result, there was no coverage for Tymoc under the policy's accidental death provision.

C. Fulkerson resists our conclusion on three grounds: textual, precedential, and prudential.

1. Start with Fulkerson's arguments about the crime exclusion's text. First and foremost, she contends that "crime" is ambiguous because it reasonably could be understood to mean only serious offenses, such as felonies. Contrast that conduct, she says, with reckless driving offenses, which, to her mind, are merely "traffic infractions" that an ordinary person may not understand to be crimes. Because the meaning of "crime" is therefore ambiguous, Fulkerson says, the crime exclusion "should be construed against the drafting party," Unum. *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 890 (6th Cir. 2020) (quoting *Perez*, 150 F.3d at 557 n.7).

Fulkerson fails to recognize that crimes have long come in many shapes and sizes. *Cf. Carroll v. United States*, 267 U.S. 132, 156–57 (1925) (tracing the felony-misdemeanor distinction to English common law). While some acts may fairly be considered more severe than others, "crime" nonetheless encompasses a wide spectrum of conduct. On one end is conduct that amounts to "a gross violation of law" or a "grave offense especially against morality." *Crime*, Merriam-Webster's Collegiate Dictionary (last visited June 2, 2022). On the other end is a "misdemeanor," "a crime" that is "less serious than a felony." *Misdemeanor*, Merriam-Webster's Collegiate Dictionary (last visited June 2, 2022); *see also Misdemeanor*, American Heritage Dictionary of the English Language 1125 (5th ed. 2011) ("A criminal offense that is less serious than a felony and generally punishable by a fine, a jail term of up to a year, or both."). At bottom, crime is a binary term—the law either punishes conduct or it does not. And although reckless driving may be a less serious crime than, say, premeditated murder, that fact does not cast doubt on whether reckless driving is itself a crime.

Fulkerson offers an additional text-based argument. She insists that reading "crime" in a broad manner will render other policy exclusions "superfluous." Here, she points to separate policy exclusions for "active participation in a riot," "the use of any prescription or non-prescription drug . . . unless used according to the prescription or direction of [a] physician," and "being intoxicated." But even accepting Fulkerson's reading of the policy, we do not see how occasional overlap in its various exclusions renders the crime exclusion superfluous. It is just as easy, if not more so, to imagine scenarios where one of these exclusions would apply while the crime exclusion would not. For example, an insured who succumbs to fatal liver damage because she accidentally took too many painkillers commits no crime. Nor does an individual who suffers a fatal fall while intoxicated. These examples and others help explain why the anti-surplusage interpretive tool often remains in the toolbox when we consider an insurance policy rich with belt-and-suspenders language. *See Santo's Italian Café, LLC v. Acuity Ins. Co.*, 15 F.4th 398, 405 (6th Cir. 2021); *see also TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010) ("[S]urplusage alone does not make an insurance policy ambiguous." (cleaned up)).

2. Next, Fulkerson argues that a handful of our earlier cases support her reading of the crime exclusion.

One is *American Family Life Assurance Co. v. Bilyeu*, 921 F.2d 87 (6th Cir. 1990) (per curiam). There, we concluded that, under Kentucky law, the phrase "crime" in an insurance policy's crime exclusion was ambiguous and, as a result, did not encompass drunk driving. *Id.* at 89–90. Yet our opinion, which adopted the district court's reasoning without explanation, does not address how the term "crime" would be interpreted through the lens of ERISA's plain meaning analysis. *Id.* at 89. Likewise, to the extent Fulkerson reads *American Family* to say that the plain meaning of "crime" requires a criminally culpable mental state, Tymoc's conduct is sufficient: Ohio's reckless driving law requires "willful or wanton disregard of the safety of persons or property." Ohio Rev. Code Ann. § 4511.20 (West 2022).

Much the same is true for *Auto Club Property-Casualty Insurance Co. v. B.T.*, 596 F. App'x 409 (6th Cir. 2015). *Auto Club*, it bears emphasizing, did not analyze whether the crime exclusion at issue there was ambiguous—the Supreme Court of Kentucky had already decided it

was. *See id.* at 413. And the underlying case *Auto Club* relied upon to find the crime exclusion ambiguous, *Healthwise of Kentucky, Ltd. v. Anglin*, 956 S.W.2d 213 (Ky. 1997), is decidedly unpersuasive. Tasked with determining whether an exclusion for "crime" encompasses losses suffered while drag racing in a public road, *Healthwise* began by acknowledging that "the average person would view [drag racing] as criminal." *Id.* at 216. Yet for reasons largely left unsaid, *Healthwise* ultimately rejected the notion that "crime . . . should be defined as the ordinary person would use the word," a far cry from the plain meaning interpretive practice ERISA demands. *See Williams*, 227 F.3d at 711 ("When interpreting ERISA plan provisions, . . . we interpret the provisions according to their plain meaning in an ordinary and popular sense.").

Next up is *Shelby County Health Care Corp. v. Majestic Star Casino, LLC Group Health Benefit Plan*, 581 F.3d 355 (6th Cir. 2009). In *Majestic Star*, we held that an ERISA-covered insurance policy's "illegal act" exclusion did not apply to the insured's driving without a license and motor vehicle insurance. *Id.* at 362–63, 375. Yes, as Fulkerson emphasizes, we deemed the term "illegal act" as used in the policy exclusion to be ambiguous because "an illegal act could be limited to violations that result in a citation or rise to a certain level of wrongdoing or could encompass all acts contrary to law." *Id.* at 370. In doing so, we compared the policy's "illegal act" exclusion to a separate "criminal act" exclusion. *Id.* at 369. We concluded that "illegal act" can have multiple meanings, and we rejected the insurer's position that "illegal act" unambiguously includes "any action that is contrary to law, even if such action is not criminal." *Id.* Yet whether the broad term "illegal act" is ambiguous says little if anything about whether the narrower terms "criminal act" and "crime" are similarly ambiguous. *Majestic Star*, in other words, is not the North Star that guides today's interpretive course.

3. Lastly, Fulkerson points us to several prudential concerns she says undermine today's conclusion. One, she worries that reading the term crime to include misdemeanor traffic offenses will result in the denial of coverage to anyone who commits "*any* illegal act subject to *any* type of punishment." In making this charge, however, Fulkerson overlooks the causation aspect of the crime exclusion. Recall that the exclusion applies only when an insured's accidental death or dismemberment was "caused by, contributed to by, or result[ed] from" those

infractions. And a non-jailable misdemeanor traffic infraction or other minor offense, even if it falls within the plain meaning of crime, often would pose little risk of causing the insured's death.

Two, Fulkerson worries that reading "crime" in broad fashion may lead to purportedly unfair results where an insurer invokes the crime exclusion for jaywalking, de minimis speeding, so-called blue laws, or other readily enacted yet seldomly enforced offenses. That is a fair point. But it is a point for another day. We do not purport to be resolving every possible application of the crime exclusion. If, for instance, "an administrator were to extend the meaning of 'crime' to cover driving 56 miles per hour in a 55-mile-per-hour zone," "the reasonableness of that position" can be resolved in due course. *Boyer*, 993 F.3d at 583. To that end, our holding is narrow: the plain and ordinary meaning of crime includes reckless driving.

\* \* \* \* \*

We reverse in part the judgment of the district court. Unum is entitled to judgment in its favor as to the applicability of the crime exclusion.